## 5571.   ATLANTIC COAST LINE RAILROAD COMPANY *v.* ADEEB.

1. The court did not err in overruling the demurrer to the petition.
2. Where, at the request of an agent of one who has prepared a blank form of contract and is named therein as a party, another person writes his own name in the space left for signing, but can not read the instrument, and it has not been read to him, and its purport has not been stated to him and is not understood by him, and his intention in writing his name is merely to comply with what he understands to be a request to write it as information, or to show how it should be spelled, no contract on his part is thereby created. And this is so even though he receives at the same time a sum of money which the writing states is the consideration of the contract, when he does not understand it to be such and does not accept it as a payment in connection with the subject-matter of the contract. It is not necessary in such a case that the person receiving the money should return or tender it before bringing a suit to recover damages for which the writing purports to be a release.
3. Where two railroad companies are sued as joint tort-feasors, on account of injuries caused by their concurrent negligence at a grade crossing, and undisputed evidence shows that the sole proximate cause of the injuries was the failure on the part of one of the defendants to exercise that extraordinary care and diligence to insure the safety of its passengers which is required by law, the court did not err in granting a nonsuit as to the other defendant, notwithstanding the injuries com-

plained of would not have occurred without negligence on the part of both.

4. While section 2687 of the Civil Code declares that whenever the tracks of different railroads cross each other, the trains of the road first constructed and put in operation have the privilege of crossing first, nevertheless, in making the prescribed stop within 50 feet of the crossing and in approaching it as provided by that section, those in charge of the train which has the right of passing first must use extraordinary care and diligence to protect the safety and welfare of its passengers.

5. There was no error in the instructions complained of, or in the refusal to charge as requested; and the evidence was sufficient to authorize the verdict.

DECIDED FEBRUARY 16, 1915.

Action for damages; from city court of Valdosta—Judge Cranford. February 6, 1914.

*Patterson & Copeland, Bennet & Branch,* for plaintiff in error.
*Whitaker & Dukes,* contra.

WADE, J. Mrs. Louise Adeeb filed suit against the Atlantic Coast Line Railroad Company and the Georgia Southern & Florida Railway Company, alleging that she had suffered various injuries on account of a collision which occurred through the concurrent negligence of the defendants at a grade crossing in the city of Valdosta, Georgia. Each defendant filed a special plea setting up accord and satisfaction, the issue raised by which was determined in each instance in favor of the plaintiff. The court, at the conclusion of the evidence for the plaintiff, granted a nonsuit as to the Georgia Southern & Florida Railway Company, but that company nevertheless filed a motion for a new trial of the issue raised by its special plea; and it brought the case to this court on exception to the refusal of the motion. The case proceeded to a verdict and judgment against the Atlantic Coast Line Railroad Company, and that defendant filed its motion for a new trial not only of the issue determined by the trial on the special plea, but also of the issue raised by its plea to the merits. The motion was overruled and the Atlantic Coast Line Railroad Company excepted to that judgment, and also to the overruling of its demurrer to the plaintiff's petition. We take up the various exceptions in the order in which they occur.

1. It is admitted in the brief for the plaintiff in error that the court did not err in overruling the general demurrer, which alleged that the petition set out no cause of action. In grounds 2 and 3 of the demurrer it is contended that the allegations of the petition

show that the defendants were not joint tort-feasors and were not jointly liable to the plaintiff in any manner, and that there were no joint acts on their part. The petition alleges in the 5th paragraph that when the passenger-train of the Atlantic Coast Line Railroad Company, on which the plaintiff was riding as a passenger, reached the point in the city of Valdosta where the main track of that road crosses the main line of the Georgia Southern & Florida Railway Company, and as the passenger-train approached the crossing and started to make its passage over the same, "by reason of the fact that the agents, servants, and employees of the said Atlantic Coast Line Railroad Company, in charge of said locomotive and train, and the agents, servants, and employees of the said Georgia Southern & Florida Railway Company, in charge of a different locomotive and cars hereafter more fully described, and at the said time being operated along the said track of the said Georgia Southern & Florida Railway Company, negligently attempted and endeavored to drive or cause the said respective trains and locomotives to pass over the said crossing at the same time, the said respective trains and locomotives collided with great force and violence." In the next paragraph the petition set out that the violent stopping and jerking of the train incident to the collision between the train on which the plaintiff was riding and the train on the track of the Georgia Southern & Florida Railway Company resulted in various injuries to the plaintiff, and the 7th, 8th, 9th, 10th, 11th, 12th, and 13th paragraphs attempted to set out in detail the precise nature of the physical injuries suffered by the plaintiff, her age, occupation, and earning capacity, etc., and the extent to which her earning capacity had been impaired by these injuries, and also the medical and other necessary expenses incurred by her on account thereof. The 15th paragraph merely sets forth facts explaining the inability of the plaintiff to more definitely describe the locomotive and train of the Georgia Southern & Florida Railway Company, which came in contact with the train upon which she was a passenger. The 16th paragraph is as follows: "The acts of negligence, and the lack of diligence hereinbefore generally referred to, causing the injuries to the petitioner set out, are as follows: (a) Because there was neither an automatic interlocking and derailing switch, nor a signal tower in which an operator was continually kept at the place where the separate tracks of the

said defendants crossed each other. (*b*) Because the engine drivers and conductors in charge of the said respective trains and locomotives did not cause the said respective trains and locomotives or either of them to come to a full stop within fifty feet of said crossing and then move forward slowly. (*c*) Because the engine drivers in charge of the said respective trains and locomotives did not approach said crossing slowly, but at a rapid and dangerous rate of speed, to wit, at the rate of fifteen or twenty miles per hour. (*d*) Because the said engine drivers and other servants in charge of said respective trains and locomotives did not keep a proper lookout for the purpose of detecting the presence of other trains, near and in the act of passing over the crossing. (*e*) Because the said engine drivers in charge of the said respective trains and locomotives in approaching said crossing ran their respective engines at such a high rate of speed that they could not stop when they each discovered the presence of the other near said crossing. (*f*) Because it was gross negligence on the part of both of the said defendants, their agents, servants, and employees, to attempt to pass over the said crossing at the same time."

It appears, from an inspection of the 5th paragraph of the petition, taken in connection with the 16th paragraph, that the plaintiff distinctly alleges that the collision and the injury occurred because the servants and employees of each of the two defendant companies, in charge of the two locomotives and trains then being operated on the respective tracks of the defendants, "negligently attempted and endeavored to drive or cause the said respective trains and locomotives to pass over the said crossing at the same time." From the allegations in the 5th paragraph it would appear that the concurrent negligence of both defendants was necessary to bring about the disastrous results to the plaintiff which followed from the collision. Had the crew of either train observed proper caution, without regard to the question as to which train was properly entitled to precedence over the other in effecting this passage over the dangerous crossing, the injury could not have resulted, and hence the injury was necessarily a consequence of the concurrent negligence of both, though the proximate cause of the injury and the consequent legal liability therefor to the plaintiff might depend exclusively upon the negligence of one. Then from the 16th paragraph it appears that the train crews of both defendants

are charged with negligence in that they both did not cause their respective trains and locomotives, or either of them, to come to a full stop within fifty feet of the crossing, and then move forward slowly; because the engine drivers in charge of both locomotives and trains failed to approach the crossing slowly, but approached it at the rapid and dangerous rate of 15 or 20 miles per hour; and further that the injury resulted on account of the negligence of the servants in charge of both locomotives and trains in failing to keep a proper lookout for the purpose of detecting the presence of other trains near and in the act of passing over the crossing; and because both trains approached the crossing at such a high rate of speed (15 or 20 miles per hour) that they could not stop when each discovered the presence of the other near the crossing; and that there was gross negligence on the part of both defendants in attempting to pass over the crossing at the same time.

From an analysis of these various allegations it can easily be seen that it required the negligence of the engine crews of both the defendant companies to bring about the collision. Had either engine come to a full stop 50 feet from the crossing, and then moved forward slowly, instead of at the rapid and dangerous rate of 15 or 20 miles per hour, and if the proper servants in charge of each engine had kept a careful lookout for the purpose of ascertaining the presence of another train near and in the act of passing over the crossing, and if each engine driver had not approached the crossing with his train at such a high rate of speed that he could not arrest the movement of his train when he discovered the presence of the other train near the crossing, and if the employees in charge of each train had not attempted to pass over the crossing at approximately the same time, no injury could have occurred. While, according to these allegations, if either defendant had observed proper care and caution, the injury would not have occurred, notwithstanding gross negligence on the part of the other, nevertheless it is obvious that it required the combined, conjoint, or concurrent negligence of *both* defendants to produce the injury; and the court did not err in overruling grounds 2 and 4 of the demurrer.

In the 3d ground of the demurrer it is contended that the petition does not clearly and distinctly set out the acts of negligence charged against the two defendants; but it appears to us that while

the negligence might have been more specifically charged, enough is set out in paragraphs 5 and 16 to sufficiently put the defendants on notice as to what negligence is relied upon by the plaintiff to sustain her action.

In the 5th ground of the demurrer it is contended that subsection. (a) of paragraph 16, which alleges negligence "because there was neither an automatic interlocking and derailing switch, nor a signal tower in which an operator was continually kept at the place where the separate tracks of the said defendants crossed each other," should be stricken because the law which prescribes the duty of railroad companies where their tracks cross does not require this at the hands of the defendants. Section 2687 of the Civil Code provides that "whenever either or any of the railroads whose tracks shall cross in the manner herein contemplated shall place at such crossings modern automatic interlocking and derailing switches, and shall establish and maintain at such crossings signal towers in which an operator shall continually be present, it shall not be necessary for trains to stop at such crossings;" but otherwise the train must "come to a full stop within fifty feet of the crossing, and then move forward slowly." So taking subsection (a) in connection with the rest of paragraph 16 of the petition, it is apparent that the negligence which the plaintiff intended to allege in this subsection was merely that the defendants, while having no automatic interlocking and derailing switch, and no signal tower at the point of crossing, nevertheless failed to stop their trains 50 feet away from the crossing, and to then move forward slowly towards the crossing. Conditions might conceivably exist that would require such devices, in the exercise of the care the law demands, even though no statute expressly provided for their installation and use at a grade crossing.

In the 6th ground of the demurrer it is contended that the allegation in subsection (e) of the 16th paragraph of the petition contains a conclusion merely as to the speed of the respective engines, and fails to state at what speed the engines approached the crossing, and therefore the allegation is too general. In subsection (c) of that paragraph it is plainly alleged that the respective trains of the two defendants did not approach the crossing slowly, but approached at a "rapid and dangerous rate of speed, to wit, at the rate of 15 or 20 miles per hour." This allegation may be taken

in aid of the allegation in subsection (*e*) which alleges merely that the locomotives approached the crossing "at such a high rate of speed that they could not stop when they discovered the presence of the other at the crossing." From the section as a whole it is easily ascertainable that the plaintiff intended to allege and did allege that the rate of speed that both engines approached the crossing was 15 or 20 miles per hour, and that this rate was a dangerous rate, and was such a high rate as..rendered it impossible for either engine to stop when the presence of the other was discovered by those in charge.

In the 7th ground of the demurrer it is contended that the petition is defective because it fails to show which of the two railroads, crossing at the point where the collision occurred, was first built, and therefore fails to show which of the said railroad companies was entitled under the law (Civil Code, § 2687) to have its train cross first at this crossing; that there was no negligence on the part of the defendant which first constructed its line of road in proceeding to cross the line of the other road. This ground of the demurrer does not appear to be insisted upon in the brief filed in behalf of the plaintiff in error. However, we may say here that the court did not err in refusing to sustain this ground, since it is obvious that the fact that trains on the road first built had, under the law, the right to cross first when trains on both tracks approached the crossing simultaneously would not excuse the agents and employees in charge of each train from the exercise of extraordinary care in an effort to preserve the safety of the passengers on that train, when by the exercise of such care the rapid approach of the other train towards the same crossing at a high rate of speed and in defiance of law could be discovered. The court therefore did not err in overruling the demurrer.

2. The next assignment of error in the bill of exceptions is as to the alleged insufficiency of the evidence to sustain the verdict on the special plea of accord and satisfaction. It is contended that a return or tender of the money received by the plaintiff in consideration of the execution of the release was necessary before bringing this action. The evidence as a whole authorized the inference, evidently drawn by the jury, that the money paid to the plaintiff, if accepted by her at all, was not accepted on account of the injuries which she suffered, and that when she signed the release offered in

evidence by the defendant to support its special plea of settlement, she did not enter into the particular contract therein set out, and did not intend to make, and did not actually make, a contract of any kind whatsoever with the defendant, but simply signed her name to a blank release, afterwards filled out, without knowledge on her part that it was a release, or a contract by which she undertook to do or refrain from doing anything whatsoever on account of her injuries. The question raised by the special plea is more fully discussed in the case of *Georgia Southern & Florida Railway Co.* v. *Adeeb,* ante, 831 (84 S. E. 323), where the finding by the jury upon an identical plea filed in the same case by the Georgia Southern & Florida Railway Company was under consideration. See also *Butler* v. *Richmond & Danville Railroad Co.,* 88 Ga. 594 (15 S. E. 668).

3. The plaintiff in error excepts to the action of the court below in granting a nonsuit as to the Georgia Southern & Florida Railway Company, and ordering the trial to proceed against the Atlantic Coast Line Railroad Company alone. It appears from an inspection of the evidence in this case that there was concurrent negligence on the part of both defendants, and that both approached the crossing without due caution and circumspection. The train on the track of the Georgia Southern & Florida Railway Company did not stop within fifty feet of the crossing, and in fact did not stop at all until it was struck by the train of the Atlantic Coast Line Railroad Company. The evidence shows further that the Atlantic Coast Line Railroad train stopped 50 feet from the crossing and then moved forward slowly towards the crossing, as required by law, though there is a variance in the testimony as to the actual rate of speed at which this train approached the crossing after it had first stopped and then renewed its motion. The evidence of the engineer in charge of the train of the Atlantic Coast Line Railroad Company clearly discloses that had he been on guard, carefully noticing the crossing and looking out for trains on the other track as he neared it, he could have stopped his train in time to prevent the collision, notwithstanding the negligence of the engineer in charge of the train of the Georgia Southern & Florida Railway Company in speeding across the dangerous point without any preliminary stopping, and without checking its speed. The engineer of the Atlantic Coast Line Railroad Company testified that he

brought his train to a full stop at the blow-post, 50 feet from the crossing, blew the whistle, and looked south, down the track of the Georgia Southern & Florida Railway Company, and had the fireman to look ahead, then rang the bell and started off; that his train proceeded slowly towards the crossing; that he could see at least 50 feet south, down the Georgia Southern and Florida Railway Company's track (from which direction the train came that collided with the Atlantic Coast Line Railroad Company's train), and there was no train in sight when he started his engine, after the stop at the blow-post, and if the train on the Georgia Southern & Florida Railway going north had been moving at the rate his train was moving, there would have been no accident, but that train did not stop at the crossing and the witness did not know whether it blew for the crossing or not; that he put on brakes in full force as soon as he saw the Georgia Southern & Florida Railway Company's engine, but it was impossible to avoid the collision which occurred, and which was sudden, violent, and jarred the whole train; that he had "always been afraid of the Georgia Southern & Florida crossing," but, after looking to satisfy himself that there was no train in sight on that road, he "pulled the engine open and started;" that he could not see much below the blow-post on the Georgia Southern & Florida track (50 feet south of the crossing on that track), because of a building that was about 100 feet from both tracks; that he looked south before he started his engine, *"but did not look afterwards.* I looked straight ahead—after I had complied with everything perfectly, I concluded the track was mine, belonged to me, and none else had any business to come up there without stopping;" that there were air brakes on his engine and that he *"could have stopped almost instantly,"* but if he had only moved his train up 25 feet from where he stopped at the blow-post, and had then "looked and seen that train coming," he could not have stopped in time, but the two trains would have collided anyhow; that he could have stopped his train in about three seconds, but he did not put on any brakes at all until his train actually struck the train on the Georgia Southern & Florida Railway, on the crossing. The fireman on the Atlantic Coast Line Railroad Company's train testified that this train came to a full stop at the "stopping board" before proceeding to cross the Georgia Southern & Florida track, and that he looked out on the north side where he

was stationed and "told the engineer all right," and the engineer blew the whistle, rang the bell, and started away slowly; that his train was going only about two miles per hour when it reached the Georgia Southern & Florida crossing, and if the train on the Georgia Southern & Florida track had been coming from the north, he could have seen it, but he did not see it until "we struck;" "the engineer was working the reverse lever and possibly did not see this train for that reason. It took him about a second or two to do that. It was a little foggy that morning, and steam was leaking out of the engine a little."

From this testimony it appears that the proximate cause of the injury was the fact that the engineer in charge of the train of the Atlantic Coast Line Railroad Company, after having complied with the requirements of law as to making a full stop 50 feet from the crossing, started up his train to approach the crossing more slowly, and having, as he expressed it and as he concluded, "complied with everything perfectly," and seeing nothing approaching on the other railroad track from the south, he concluded the track was his, and, having the right of way, that no one else "had any business to come up there without stopping," and therefore he did not again look south, after starting the engine, but looked straight ahead, though he was on the south side of his engine. He says explicitly that he could see as far as the blow-post on the Georgia Southern & Florida Railway track, 50 feet south of the crossing, at the time he stopped his engine and looked south, and if he had *then* observed anything on the track, he could have stopped his train instantly with his air-brakes, going at the slow rate of speed at which the train was then moving; but seeing nothing *at the time he started* his train, *he never again looked,* and ran into the train that was crossing in front of him, without ever having actually seen that train until the shock of the collision attracted his attention. There was testimony, from a witness who was in the passenger-coach behind the engine, that it was possible to see down the Georgia Southern & Florida Railway track a distance of 30 or 40 yards from the crossing, and that in his opinion "the Coast Line engineer could have seen the cars and the engine of the Georgia Southern at least 50 yards down the track." Another witness stated, that he was in the second-class coach at the back, and saw the Georgia Southern & Florida Railway train through a window, that the Atlantic Coast

Line train approached the crossing at the rate of 4 or 5 miles per hour, and the Georgia Southern & Florida approached the same crossing at 14 or 15 miles per hour, and did not stop; that he saw the Georgia Southern & Florida train as soon as it came in view from behind the ice plant, *about 150 feet away.* The fireman attempted to excuse the engineer for his failure to see the approaching train on the other track, by suggesting that the engineer was working the reverse lever, and "possibly" did not see the train for that reason, and by adding that it was a little foggy that morning, and also that steam was leaking out of the engine. Neither the engineer himself, nor any one else who testified, suggested the presence of any fog or escaping steam which could have interfered with a clear view down the Georgia Southern & Florida Railway track in a southerly direction, had the engineer been looking in that direction. It is evident, from the testimony of the engineer himself, that had he not relied upon his previous compliance with the legal requirements up to the time he started forward from the blow-post, no accident would have occurred. He says himself that he had always been afraid of this particular crossing, and yet, though asserting that on account of an intervening building he could not see more than 50 feet in a southerly direction down the track of the Georgia Southern & Florida Railway (or what was beyond the building), he says that after glancing in that direction and seeing nothing on this short stretch of track, he started his engine forward, without again looking in that direction or even apparently being on the alert to avoid the possibility of injury from any train which might be traveling in a northerly direction on that track. In fact, he did not look again in a southerly direction but looked straight ahead, relying blindly upon what he conceived to be his exclusive right to the track, and did not discover the presence of the other train until his engine actually collided therewith, and not until then did he put on brakes. The engineer must have relied also upon his knowledge as to the usual schedule over the Georgia Southern & Florida Railway, as otherwise it is inconceivable that he would have approached a crossing which he himself admits he had always regarded as dangerous, without keeping a most careful outlook and exercising proper care. It was the duty of those in charge of the train to exercise extraordinary care to preserve the life and safety of the passengers in their charge, and if

this duty had been fully observed by the engineer and the fireman in charge of the engine, the train could have been stopped before the collision occurred and notwithstanding the negligence of those in charge of the train on the other road in approaching the crossing without having previously stopped and without moving forward slowly. Irrespective of what may have been the comparative diligence of the two roads as to each other, and regardless of what liabilities might have resulted thereby from one to the other, the proximate cause of .the injury to the plaintiff was the failure on the part of the engineer on the Atlantic Coast Line Railroad Company to keep a proper lookout, and to stop his train upon the discovery of the fact that the train on the other road was negligently approaching the crossing. Therefore, notwithstanding the negligence of the Georgia Southern & Florida Railway Company, the court did not err in granting a nonsuit as to that defendant, under the undisputed evidence going to establish absolutely that the exercise of due and lawful care on the part of the employees of the Atlantic Coast Line Railroad Company would have prevented the injury.

4, 5. (a) That ground of the motion for a new trial which complains that the court charged that under certain circumstances named, the jury should return a verdict in favor of the defendant, if the defendant "was not otherwise negligent," whereas the court should have instructed the jury to return such a verdict if they found certain facts to be true, and found that the defendant "was not otherwise negligent, as charged in plaintiff's petition," is without merit, when this statement is taken together with the entire charge. The jury must have understood from the charge as a whole that the court limited their consideration of negligence on the part of the defendant to the particular negligence charged in the plaintiff's petition, and the mere failure to qualify the statement in this one instance and in this connection is not such error as to demand a reversal.

(b) The plaintiff in error insists that the court erred in refusing to give to the jury a requested instruction to the effect that if the jury believed, from the evidence, that the conductor and the engineer in charge of the train of the Atlantic Coast Line Railroad Company, on the 15th day of January, 1912, caused the train to come to a full stop within 50 feet of the point where that road

crosses the track of the Georgia Southern & Florida Railway Company, and then to move forward slowly, and further believed that the Atlantic Coast Line Railroad Company or its predecessors in title first constructed this road, and put its trains in operation before the Georgia Southern & Florida Railway Company's railway was constructed, and before the latter put its trains in operation, then the Atlantic Coast Line Railroad train had the privilege to cross first, and if the collision which occurred at the crossing was due to the fact that the Georgia Southern & Florida Railway train did not accord to the Atlantic Coast Line Railroad train this privilege to cross first, and this demand was incurred by reason of its failure so to give this privilege of crossing first to said train of the Atlantic Coast Line Railroad Company, their verdict should be in favor of the last-named company.

(c)   The plaintiff in error further insists that the court erred in refusing to give a charge requested which was in substance as follows: that if the jury believed, from the evidence, that the conductor and the engineer in charge of the Atlantic Coast Line Railroad Company's train, on the 15th day of January, 1912, caused that train to come to a full stop within 50 feet of the place where that road crosses the track of the Georgia Southern & Florida Railway Company, and then moved forward slowly, and that if they further believed from the evidence that the Atlantic Coast Line Railroad Company or its predecessors in title constructed its road and put its trains in operation before the Georgia Southern & Florida Railway Company constructed its road and put its trains in operation, then the train of the Atlantic Coast Line Railroad Company had the privilege to cross first, and if the injury of the plaintiff was due to the fact that the train of the Georgia Southern & Florida Railway Company did not come to a full stop within 50 feet of the place of crossing, and then move forward slowly, their verdict should be in favor of the Atlantic Coast Line Railroad Company.

The court charged the jury fully as to the right and privilege of the company which first constructed its line of road and put its trains in operation to cross first at a grade crossing, and as to the duty of those in charge of trains approaching such a crossing to come to a full stop within 50 feet of the crossing and then move forward slowly, and specifically instructed them that if they be-

lieved, from the evidence, that the Atlantic Coast Line Railroad
Company constructed its road first and put its trains in operation
before the trains of the Georgia Southern & Florida Railway Com-
pany were operated, then the train of the Atlantic Coast Line Rail-
road Company would, under the law, have the privilege of first
crossing, and that if injury to the plaintiff was due to the fact
that the said train was exercising this privilege, and that the At-
lantic Coast Line Railroad Company was not otherwise negligent,
they should find in its favor, provided however that "in mak-
ing the stop and in making the approach to the crossing, the At-
lantic Coast Line Railroad Company's agents and employees exer-
cised that degree of care and caution the law puts upon them
relative to passengers, to wit: they must use extraordinary care
and diligence to protect the safety and welfare of the passengers."

It scarcely seems necessary to do more than state the proposition,
in order to disclose the fallacy of the contention put forth in the
two requests to charge, which the court properly rejected. If the
mere fact that under the law the trains of the Atlantic Coast Line
Company had the right of way over trains on the intersecting track
of the Georgia Southern & Florida Railway Company was a com-
plete defense for lack of proper care on the part of those in charge
of trains on the Atlantic Coast Line Railroad approaching the
crossing, it would excuse absolute and utter recklessness even after
the discovery of danger on the crossing on account of a disregard
of law by the other railroad company, or would excuse, on the part
of the employees of the Atlantic Coast Line Railroad Company
when approaching the crossing, an entire absence of care to ascer-
tain whether or not trains on the intersecting track were liable or
likely to obstruct the same, or were being run at such a rapid rate
of speed or in such a dangerous way as to jeopardize the safety of
passengers on the Atlantic Coast Line Railroad Company's train.

The trial judge very succinctly and clearly put before the jury
the respective rights of the parties, plainly advised them that no
recovery could be had against the Atlantic Coast Line Company,
unless the injuries resulted from negligence on its part, and very
properly instructed them that notwithstanding the precedence to
which the company constructing the first road was entitled under
the law, this did not authorize those in charge of a train, and upon
whose care and diligence depended human safety and human lives,

to assume an absence of danger at such a railroad crossing, because of the further assumption that since the right of first crossing belonged to the trains of one road rather than to those of another, this right would not be infringed upon by accident or design, and that the officers and employees of the dominant train could rely thereon as an absolute protection to their passengers.

We think the trial was free from material error, and the verdict was authorized by the evidence.

*Judgment affirmed.   Broyles, J., not presiding.*